# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ARELY JUAREZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 09 C 4021** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Arely Juarez seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1] Plaintiff filed a Motion for Judgment on Pleadings, and the Commissioner filed a Motion for Summary Judgment. Plaintiff seeks a judgment reversing or remanding the Commissioner's final decision, while the Commissioner seeks a judgment affirming his decision. For the reasons set forth below, plaintiff's motion is granted [dkt. 18] and defendant's motion is denied [dkt.25].

## PROCEDURAL HISTORY

On June 14, 2006, plaintiff filed an application for DIB, alleging that she became disabled on February 8, 2006 because of severe left shoulder pain with movement.[2] Plaintiff's claim was denied on July 20, 2006.[3] Plaintiff then filed a request for reconsideration, which was denied on November 8, 2006. On December 15, 2006, plaintiff requested a hearing before an

---

[1] 42 U.S.C. § 405(g).
[2] R. at 89, 91.
[3] R. at 45-48.

Administrative Law Judge ("ALJ").[4] Plaintiff's request was granted and a hearing took place before ALJ E. James Gildea on April 2, 2008.[5] Following the hearing, the ALJ issued an unfavorable decision, finding plaintiff was not disabled at any time between February 8, 2006 through the date of decision, October 1, 2008.[6] Plaintiff then filed a request for review of the ALJ's decision with the Social Security Administration Appeals Council ("Appeals Council") on November 24, 2008.[7] The Appeals Council denied review of the ALJ's decision on May 8, 2009.[8] The ALJ's October 1 decision, therefore, stands as the final decision of the Commissioner. Plaintiff filed this action on July 6, 2009.

STATEMENT OF FACTS

### A.     Introduction and Medical Evidence

This subsection is a brief review of the facts in the medical record that the ALJ reviewed at plaintiff's hearing and considered when rendering his decision. These facts provide a brief summary of plaintiff's medical history and the reasons she applied for DIB.

Plaintiff was born on July 25, 1970, making her thirty-eight years old on the date the ALJ issued his final decision.[9] She finished high school in Mexico[10] and immigrated to the United States in 1989.[11] Between 1991 and 2006, plaintiff was employed as a plant assembler, a packer, and a mailbag inspector.[12] On April 17, 2003, plaintiff suffered a work-related right shoulder injury when she tried to open a bag at the post office.[13]

---

[4] R. at 57-59.
[5] R. at 19-42.
[6] R. at 10-15.
[7] R. at 5.
[8] R. at 1-3.
[9] R. at 89.
[10] R. at 22.
[11] R. at 33.
[12] R. at 115-18.
[13] R. at 252.

Because the medical records of plaintiff's treatment from the year 2003 are scarce, the Court outlines plaintiff's relevant treatment for that year from the notes of Surrender Dhiman, M.D., who treated plaintiff from January 2004 to February 2006.[14] So the following are simply Dr. Dhiman's notes of plaintiff's treatment history in 2003 and do not relate to his treatment of plaintiff. Dr. Dhiman's notes reflect that after plaintiff's work-related injury in April 2003, she went to the emergency room Quick Care in Bolingbrook, Illinois.[15] Dr. Dhiman's notes also indicate that although plaintiff returned back to work, her shoulder was getting worse.[16] Additionally, Dr. Dhiman's notes reflect that in May 2003, plaintiff saw Mark Moran, M.D., who ordered a magnetic resonance imaging ("MRI") of plaintiff's shoulder and cervical spine.[17]

The MRI was taken on May 8, 2003 at Silver Cross Hospital in Joliet, Illinois.[18] The MRI indicated that there were no abnormalities in plaintiff's cervical spine.[19] Later that month, on May 30, 2003, plaintiff went back to Silver Cross Hospital for a MRI of her shoulders.[20] The MRI of the right shoulder showed degenerative changes of the acromioclavicular joint, with findings suggestive of tendinitis and evidence of a small joint effusion.[21] The MRI of the left shoulder indicated possible tendonitis, as well as impingement, with a possible tear in the glenoid lambrum.[22]

Dr. Dhiman's notes also indicate that Dr. Moran referred plaintiff to Giridhar Burra, M.D. for a pinched nerve treatment.[23] Additionally. Dr. Dhiman's notes reflect that plaintiff saw

---

[14] R. at 96.
[15] R. at 252.
[16] Id.
[17] Id.
[18] R. at 273.
[19] Id.
[20] R. at 271, 275.
[21] R. at 275.
[22] R. at 271.
[23] R. at 252.

Dr. Chang (the record does not provide Dr. Chang's full name), a neurologist, who ordered an electromyography ("EMG").[24] Dr. Dhiman's noted that the EMG did not show any nerve damage.[25] Finally, Dr. Dhiman's notes reflect that plaintiff was then referred back to Dr. Burra, who advised her to get a second opinion on her right shoulder pain.[26] That is how plaintiff eventually came to be treated by Dr. Dhiman. (Plaintiff's primary care physician at that time, Jose Battistini, M.D., referred plaintiff to Dr. Dhiman.)[27]

On January 13, 2004, plaintiff saw Dr. Dhiman for an initial visit.[28] Dr. Dhiman reported that plaintiff had right shoulder acromioclavicular joint arthritis and subacromial bursitis.[29] From March 2004 to June 2004, plaintiff saw Dr. Dhiman five times, and during that time he treated her right shoulder with injections and therapy.[30] Additionally, at some point in February or March 2004, plaintiff saw Dr. Marra (the record does not provide Dr. Marra's full name) regarding her shoulder pain.[31] Because no medical records of plaintiff's visits to this doctor can be found in the record, it is impossible to determine Dr. Marra's credentials and a proper spelling of his name (he is also referred as Dr. Mara,[32] Dr. Matta,[33] and Dr. Mura[34]). Nevertheless, plaintiff's visit to this doctor is mentioned in the reports of other doctors.[35] Also, on May 12, 2004, Surendra Gulati, M.D. performed an EMG on plaintiff's right shoulder and reported a

---

[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] R. at 251-52.
[29] *Id.*
[30] R. 236-50.
[31] R. at 247, 249.
[32] R. at 203.
[33] R. at 247.
[34] R. at 249.
[35] R. at 203, 247, 249, 298.

normal study with no evidence of median or ulnar neuropathy.[36]

On September 21, 2004, after rounds of conservative treatment consisting of medication, physical therapy, and injections, plaintiff saw Dr. Dhiman again.[37] Dr. Dhiman determined that plaintiff's conditions included chronic right shoulder pain, impingement, and acromioclavicular arthritis.[38] On that same day, Dr. Dhiman performed an arthroscopic decompression surgery on plaintiff's right shoulder.[39] The medical records further reflect that after the surgery, plaintiff visited the office of Dr. Dhiman twelve times between September 2004 and November 2005.[40] During that period plaintiff was treated for her shoulder pain by Dr. Dhiman and his colleague, George Verghese, M.D.

In January 2005, because of plaintiff's neck and shoulder pain complaints, Dr. Dhiman referred plaintiff to Mary Monaco, D.O. for a trigeminal neuralgia examination.[41] Consequently, in January and February 2005, plaintiff had MRIs of her brain, thoracic spine, and cervical spine.[42] Dr. Monaco reported that all three MRIs were essentially normal.[43] Additionally, in March 2005, plaintiff had an EMG of both her shoulders, which showed a normal study with no evidence of median or ulnar neuropathy.[44]

On November 25, 2005, plaintiff came back to the office of Dr. Dhiman for evaluation of pain in her shoulders.[45] That day, Dr. Verghese evaluated plaintiff.[46] Dr. Verghese reported that he was concerned about a lack of consistency in plaintiff's complaints and her non-physiological

---

[36] R. at 260.
[37] R. at 255-59.
[38] R. at 258.
[39] R. at 255-56.
[40] R. at 207-34.
[41] R. at 226.
[42] R. at 265-70.
[43] *Id.*
[44] R. at 263-64.
[45] R. at 207.
[46] *Id.*

and non-anatomical distribution of her symptoms.[47] On February 6, 2006, plaintiff returned to

Dr. Dhiman's office, who documented that plaintiff had tenderness in the intrascapular region

and over the acromioclavicular joints.[48] Dr. Dhiman also noted that plaintiff continued to

complain of chronic shoulder pain.[49] Dr. Dhiman stated that he was going to get another opinion

from Anthony Romeo, M.D. regarding plaintiff's shoulder pain.[50] The records, however, reflect

that Dr. Dhiman did not get a second opinion from Dr. Romeo or from any other doctor.

In March 2006, plaintiff stopped her treatment with Dr. Dhiman's office.[51] At about

that time, she began her treatment with William Farrell, M.D.[52] The records show that on March

10, 2006, plaintiff went to Silver Cross Hospital for another MRI of both of her shoulders.[53] The

MRI indicated that plaintiff's right shoulder demonstrated tendinosis of the supraspinatus tendon,

while her left shoulder showed impingement and tendinosis of the left supraspinatus tendon.[54]

There was no evidence of a rotator cuff tear in either shoulder.[55] On April 25, 2006, Dr. Farrell,

conducted a physical examination of plaintiff.[56] Dr. Farrell reported some relief in plaintiff's

symptoms, attributing it to the use of Naprosyn,[57] an anti-inflammatory drug, and TENS unit,[58] a

transcutaneous electrical nerve stimulator.[59] He also stated that plaintiff reported continued

bilateral shoulder pain.[60] Dr. Farrell recommended plaintiff continue with TENS unit and

---

[47] *Id.*
[48] R. at 203.
[49] *Id.*
[50] *Id.*
[51] R. at 202.
[52] R. at 279.
[53] R. at 278.
[54] *Id.*
[55] *Id.*
[56] R. at 277.
[57] *Id; see also* MERRIAM-WEBSTER'S MEDICAL DICTIONARY 486 (2006). The dictionary defines "Naprosyn" as a trademark used for a preparation of naproxen. "Naproxen" is defined as an anti-inflammatory analgesic antipyretic drug used especially to treat arthritis.
[58] *Id.* at 752.
[59] R. at 277.
[60] *Id.*

exercise.[61] He also noted and agreed with Dr. Dhiman's suggestion of getting an additional opinion from Dr. Romeo.[62]

In her first Disability Report dated June 14, 2006, she alleged that severe left shoulder pain with movement prevented her from working as a mailbag inspector as of February 8, 2006.[63] She alleged that she could not lift anything and could not move her arm because her left shoulder and back caused her pain.[64]

On July 19, 2006, shortly after plaintiff filed for DIB with the SSA, Richard Bilinsky, M.D., prepared a physical residual functioning capacity assessment ("RFCA") for the SSA.[65] Dr. Bilinsky concluded that plaintiff could occasionally lift or carry twenty pounds,[66] frequently lift or carry ten pounds,[67] stand and walk for six hours in an eight-hour workday,[68] sit with normal breaks for six hours in an eight-hour workday,[69] and had a limited ability in upper extremities to push or pull.[70] Dr. Bilinsky also concluded that plaintiff could frequently stoop, kneel, crouch, and climb ramps, stairs, ladders, ropes, or scaffolds.[71] Finally, Dr. Bilinsky concluded that plaintiff could occasionally balance and crawl.[72]

On September 8, 2006, Dr. Romeo, an orthopedist, performed a consultive examination of plaintiff at the request of plaintiff's then-attorney, Bradley Dworkin (this is the same Dr. Romeo that Dr. Dhiman recommended plaintiff to see for a second opinion back in February 2006).[73] Dr.

---

[61] *Id.*
[62] *Id.*
[63] R. at 93.
[64] *Id.*
[65] R. at 280-87.
[66] R. at 281.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] R. at 282.
[72] *Id.*
[73] R. at 289.

Romeo also reviewed plaintiff's records.[74] In his report, Dr. Romeo noted that Dr. Marra evaluated plaintiff in February 2004 and found that there was a non-anatomic distribution in plaintiff's pain that did not correlate with the MRI findings.[75] Dr. Romeo noted that Dr. Marra was unable to find any structural abnormality in plaintiff's shoulders that could account for the pain.[76] Dr. Romeo also reported that Dr. Marra did not recommend any further surgical or medical intervention regarding plaintiff's shoulders because of limited benefit.[77] Additionally, Dr. Romeo noted that plaintiff's functional capacity evaluation was performed in June 2006 and that "she failed 18 out of 23 objective criteria, mostly because of failed effort."[78] Dr. Romeo diagnosed plaintiff with left shoulder mild impingement symptoms and mild bicipital tendonitis.[79] Dr. Romeo reported that he did not feel that left shoulder surgery was going to be a predictable and reliable relief for plaintiff's pain complaints; he also did not recommend any therapy.[80] Also, Dr. Romeo recommended transition to non-narcotic pain medication.[81]

On October 3, 2006, plaintiff returned to Dr. Farrell, who documented that therapy and injections had not helped her.[82] He also noted that plaintiff continued to experience subacromial-like rotator cuff tendonitis.[83]

**B.      The April 2, 2008 Hearing**

Plaintiff's hearing before the SSA occurred on April 2, 2008 in Orland Park, Illinois.[84]

---

[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] R. at 289-90.
[79] R. at 291.
[80] *Id.*
[81] *Id.*
[82] R. at 294.
[83] *Id.*
[84] R. at 17.

Plaintiff appeared in person and was represented by her attorney, Courtney Quilter.[85] A vocational expert ("VE"), Glee Ann L. Kehr, also testified.[86] At the beginning of the hearing, the plaintiff's attorney stated that she was not aware of any additional exhibits (that were not already in the file) that needed to be added to the file.[87]

Plaintiff then discussed her educational background and work history with the ALJ.[88] When asked if she had looked for any other employment after she stopped working at her last job as a mailbag inspector, plaintiff responded that she had not.[89] She explained that she could not work because she was in pain all the time.[90] She stated that she had sharp pain in her fingers when she moved them.[91]

Plaintiff then testified about her visits with Dr. Farrell, her orthopedist.[92] When asked if she previously saw Dr. Dhiman, plaintiff responded that he performed surgery on her right shoulder, but she did not see him anymore because of the change in her insurance.[93] When asked if she had a surgery on her left shoulder, plaintiff responded that Dr. Farrell told her that she could have surgery once she could not handle the pain.[94] Although plaintiff's treatment at Henry Fuentes, M.D.'s medical office was not a part of the medical record before the ALJ, plaintiff mentioned that she saw Dr. Fuentes, who told plaintiff that she could have surgery if she wanted, but he was not sure if it was going to help her.[95]

---

[85] *Id.*
[86] R. at 35-40; *see also* R. at 14.
[87] R. at 20.
[88] R. at 22-24.
[89] R. at 24-25.
[90] R. at 25.
[91] *Id.*
[92] R. at 25-26.
[93] R. at 26.
[94] *Id.*
[95] *Id.*

When asked about surgery on her right shoulder, plaintiff responded that it helped her at the beginning, but then stated that the shoulder was getting worse.[96] When asked how long her left shoulder had been bothering her, plaintiff responded that it started when her right side started hurting her.[97] When the ALJ asked her about limitations in her arms, plaintiff responded that she could not do things that she used to do.[98] The ALJ then asked plaintiff if she was at all limited from completing her household chores and plaintiff responded that she was limited to the point that she needed help from her husband or children.[99] When asked if she could lift her arms over her head, plaintiff responded that she could not do that because of pain.[100]

The transcript of the hearing also reflects that plaintiff brought two compact discs of medical records to the hearing.[101] After plaintiff introduced those discs, there was a brief discussion between the ALJ, plaintiff, and her attorney about what was on those compact discs.[102] It is not completely clear what each person was referring to in that brief exchange, yet, plaintiff made several references to her treatment from Dr. Farrell in the year of 2007 as well as to other recent treatment, including several MRIs.[103] The following is an excerpt of that dialogue starting with plaintiff stating:

CLMT:       I got the, the MRI that Dr. Farrell sent me to get. I got that recently. I had it two weeks ago or last week. I have it right here.

Q:       Do you have that?

A:       Yeah.

---

[96] R. at 26-27.
[97] R. at 27.
[98] *Id.*
[99] *Id.*
[100] R. at 28.
[101] R. at 29-30.
[102] R. at 28-30.
[103] *Id.*

ATTY:    Uh-huh.

CLMT:    I got two from last year , too.

ATTY:    Do you have a report in there?

CLMT:    This is from this year, the 26th.

ATTY:    Okay.

CLMT:    And this is the 2007.

ATTY:    Here's the one that says –

ALJ:     All right.  For the record she's –

ATTY:    What's the paper in there?

ALJ:     the claimant has –

CLMT:    I have, is it, this is from the last year.

ALJ:     – given us two compact disks.

CLMT:    And this is from my doctor reports.

ATTY:    Okay.

ALJ:     Is there a report accompanying that? I think there's, we have two disks, but I think they're duplications.

CLMT:    No. One is from last year, and the other one is from this year.

ALJ:     Oh, okay. I see what you mean. Okay. And there is a copy of the report itself, too, a narrative?

ATTY:    There's one of them, yeah.

ALJ:     May we see it?

CLMT:    That one's from the last year.

ALJ:     May we see that?

| | |
|---|---|
| ATTY: | Here's 20/07. |
| ALJ: | Okay. Thank you. |
| ATTY: | I believe some of these records, I'm not sure. |
| CLMT: | This is – |
| ATTY: | Dr. Farrell's. |
| CLMT: | This is Dr. Farrell's record. |
| ATTY: | Yeah. |
| ALJ: | Okay....I'm going to pass that back, because we do have that.[104] |

After that brief exchange, the ALJ moved on by asking plaintiff if she had pain just in her shoulders, and she responded that she had pain in her shoulders, back, and neck.[105] She also testified that when she had bad shoulder pain, the pain would travel up to her jaw.[106] When asked if the pain was the same on both sides, she responded that she had more pain in her left side.[107] When asked if she took any medication, plaintiff responded that she took two 500 mg. tablets of Vicodin and TENS unit every day.[108] She also stated that she had sharp pain in her fingers and that her doctor informed her that it was the beginning of arthritis in her fingers.[109] Plaintiff also testified that she followed her doctor's advice and started taking glucosamine,[110] a nutritional supplement used in the treatment of pain caused by osteoarthritis.[111]

Plaintiff's attorney, Ms. Quilter, then questioned plaintiff.[112] When asked about pain in her

---

[104] R. at 28-30.
[105] R. at 30.
[106] *Id.*
[107] R. at 31.
[108] R. at 31-32.
[109] R. at 32.
[110] *See* MOSBY'S POCKET DICTIONARY OF MEDICINE, NURSING, & HEALTH PROFESSIONS 573 (6th ed. 2010). The dictionary defines "glucosamine sulfate" as "the sulfate salt of glucosamine, prepared artificially as a nutritional supplement and as a popular remedy for osteoarthritis."
[111] R. at 32.
[112] R. at 33.

shoulders, plaintiff responded that most of the time it was constant.[113] When asked to describe difficulties in reaching her arms overhead, plaintiff responded that it hurt to lift her arms over her head.[114] She also testified that her shoulders bothered her when she tried to pull or push things.[115]

The VE, Glee Ann L. Kehr, testified next.[116] She first testified that plaintiff's past relevant work included two assembly unskilled positions: one of which was light and the other one was medium.[117] The ALJ then asked the VE whether a hypothetical young individual with a high school equivalent education, plaintiff's past work experience, and certain exertional limitations would still be able to perform plaintiff's past work.[118] The exertional limitations given by the ALJ consisted of the ability to perform lifting and/or carrying up to five pounds, sitting up to six hours in an eight-hour workday, walking/standing up to two hours, and occasional reaching with both upper extremities.[119] The VE responded that such a person would not be able to perform plaintiff's past work.[120] The ALJ, then, asked the VE if other positions within the described limitations were appropriate for such a person.[121] The VE responded that there were some jobs within these limitations.[122] She identified the following positions: an address clerk with 3,400 jobs existing in the Chicago metropolitan area; a telephone clerk, with 4,700 jobs existing in the Chicago metropolitan area, and; an order clerk, with 8,000 jobs existing in the Chicago metropolitan area.[123] The VE stated that those were sedentary, unskilled positions that required

---

[113] *Id.*
[114] R. at 34-35.
[115] R. at 35.
[116] R. at 35-40.
[117] R. at 36-37.
[118] R. at 37.
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] R. at 38.

the capability of understanding minimal reading and writing.[124]

## C.    The ALJ's October 1, 2008 Decision

In his October 1, 2008 decision, the ALJ determined that plaintiff was not under a disability as defined in the Social Security Act ("the Act") and, therefore, was not entitled to any DIB.[125] The ALJ followed the five-step evaluation process outlined in 20 C.F.R. § 404.1520.[126] Under this social security regulation, the ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[127] A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[128]

Initially, the ALJ found that plaintiff met the insured status requirements of the Act through June 30, 2011.[129] At step one, the ALJ found that plaintiff met the requirements because she had not engaged in substantial gainful activity since February 8, 2006.[130] At step two, because plaintiff had bursitis and tendonitis of the right shoulder and tendinosis of the left shoulder, the ALJ determined that she had several severe impairments listed in the Act and, thus, met the

---

[124] *Id.*
[125] R. at 15.
[126] R. at 11.
[127] 20 C.F.R. § 404.1520.
[128] *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).
[129] R. at 12.
[130] *Id.*

requirements of step two.[131] Despite finding several severe impairments, the ALJ found that plaintiff failed the third step of the process because she lacked an impairment or combination of impairments that amounted to one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4.[132]

The ALJ next determined plaintiff's residual functional capacity ("RFC").[133] A claimant's RFC represents what a claimant can perform despite his or her physical or mental limitations.[134] The ALJ found that plaintiff had the RFC to perform lifting and/or carrying up to five pounds, sitting up to six hours in an eight-hour workday, walking/standing up to two hours, and occasional reaching with both upper extremities.[135] The ALJ found that while the plaintiff's impairments could reasonably be expected to produce the symptoms she alleged, the plaintiff's statements concerning the intensity, duration, and limiting effects of these symptoms were not entirely credible.[136] In support of this finding, the ALJ noted that the plaintiff had claimed such "extreme limitations that they seemed implausible."[137] More specifically, the ALJ pointed out that plaintiff wrote in September 2006 that "she had shoulder pain when cutting food with a knife, holding a book for a long period of time, and writing with a pen or pencil."[138]

Next, the ALJ listed several findings regarding plaintiff's physical conditions. The ALJ stated that plaintiff's claim in the medical record of a problem climbing stairs in June 2006 was unfounded.[139] In the next sentence, he noted that plaintiff testified to sharp pain in her fingers and

---

[131] *Id.*
[132] R. at 13.
[133] *Id.*
[134] 20 C.F.R. § 404.1545(a)(1).
[135] R. at 13.
[136] *Id.*
[137] *Id.*
[138] *Id.*
[139] *Id.*

hands, pain with reaching overhead, pushing, pulling, and lifting and carrying only five pounds, and constant shoulder pain.[140] Finally, the ALJ stated that the opinions of the state agency medical consultants, who conducted plaintiff's RFC assessment on July 19, 2006, were entitled to little weight because they did not have the benefit of medical evidence submitted subsequent to that decision.[141] The ALJ provided no explanation as to why he listed these three findings together and what they were provided for.

Having determined plaintiff's RFC, the ALJ proceeded to step four to determine whether plaintiff could perform any past relevant work.[142] Because plaintiff's past relevant work consisted of a plant assembler position and a mailbag inspector position, both unskilled with light to medium exertional levels, the ALJ found them to be inconsistent with plaintiff's RFC.[143] Consequently, the ALJ found that plaintiff was unable to perform any past relevant work.[144]

Finally, the ALJ examined the VE's testimony in assessing whether plaintiff could make a successful adjustment to other work.[145] Assessing plaintiff's age, education, work experience, and the RFC, the ALJ concluded that plaintiff was capable of performing other work that existed in significant numbers in the national economy.[146] Based on the VE's testimony, the ALJ listed three clerk positions, which plaintiff could perform: an address clerk, a telephone clerk, and an order clerk.[147] The ALJ, therefore, concluded that because plaintiff was capable of performing other work, she was not disabled at any time since February 8, 2006.[148]

---

[140] *Id.*
[141] R. at 14.
[142] *Id.*
[143] *Id.*
[144] *Id.*
[145] R. at 14-15.
[146] *Id.*
[147] R. at 15.
[148] R. at 15.

STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[149] In this review, the Court examines the entire record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.[150] The Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free from legal error."[151] Substantial evidence is evidence "a reasonable mind might accept as adequate to support a conclusion."[152] Where reasonable minds differ over conflicting evidence, the Commissioner is responsible for determining whether a plaintiff is disabled.[153] However, the Commissioner's decision is not entitled to unlimited judicial deference.[154] An ALJ "must minimally articulate his reasons for crediting or discrediting evidence of disability."[155] The Court conducts a "critical review of the evidence" and will not uphold the ALJ's decision when "it lacks evidentiary support or an adequate discussion of the issues."[156]

ANALYSIS

In her brief, plaintiff argues that the ALJ's decision must be reversed or remanded because the ALJ erred by improperly: (1) reaching a decision without obtaining current medical

---

[149] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

[150] *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000).

[151] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

[152] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Powers*, 207 F.3d at 434.

[153] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 2000) (*quoting Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).

[154] *Clifford*, 227 F.3d at 870 (*quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).

[155] *Id.*

[156] *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford*, 227 F.3d at 869, and *Steele*, 290 F.3d at 940).

17

evidence; (2) determining plaintiff's RFC; and (3) determining plaintiff's credibility. Finally, plaintiff argues that the ALJ erred by relying on the testimony of the VE. The Court now examines each of these allegations in turn.

## A.     The ALJ's Duty to Obtain Current Medical Evidence

First, Plaintiff argues that the ALJ failed to adequately develop a fair and full record by not obtaining current medical evidence. Because the last medical record reviewed by the ALJ was dated a year and a half before the hearing, plaintiff argues that more current medical opinions would have supported her claims of disability. Defendant responds that the additional evidence that was not of record before the ALJ was insignificant and, as a result, its absence does not warrant remand of this case based on a complete record.

While a claimant bears the burden of proving disability, an ALJ in a Social Security hearing has a duty to develop a full and fair record.[157] There is no absolute requirement that an ALJ has to update the medical records to the time of the hearing.[158] However, under section 404.1512(d) of Title 20 of the Code of the Federal Regulations, before determining that a claimant is not disabled, the SSA has the responsibility to develop the claimant's "complete medical history," defined as records of the claimant's medical sources covering at least the twelve months preceding the month in which the claimant's application is filed.[159] The SSA will try to obtain additional evidence if the evidence before it is insufficient to determine whether the claimant is disabled or, if after weighing the conflicting evidence, the SSA cannot reach a conclusion.[160] Additionally, an ALJ is required to make a "reasonable effort" to ensure

---

[157] *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991).

[158] *See Luna v. Shalala*, 22 F.3d 687, 692-93 (7th Cir. 1994).

[159] 20 C.F.R. § 404.1512(d).

[160] 20 C.F.R. § 404.1527(c)(3).

that the claimant's record contains, at a minimum, enough information to assess the claimant's RFC and to make a disability determination.[161] In a case where an applicant is represented by an attorney, the Commissioner may assume that the applicant is making her "strongest case for benefits;"[162] however, it does not relieve an ALJ of his duty to develop a full and fair record.[163]

In the present case, because plaintiff applied for DIB on June 14, 2006, pursuant to the regulations, the ALJ had a responsibility to develop plaintiff's "complete medical history" covering at least twelve months preceding June 2006. The Court finds that although the ALJ reviewed plaintiff's medical records for the period from May 2003 to October 2006, he did not meet his burden of developing a full and fair record by not obtaining "complete medical history."[164]

In the case at bar, the last medical record reviewed by the ALJ was dated one and a half years before the hearing. But plaintiff states that because she had additional treatment in the period from October 2006 to April 2008, she brought two compact discs of additional medical evidence to the April 2, 2008 hearing. The record reflects that when plaintiff introduced those two compact discs at the hearing, a somewhat confusing dialogue between the ALJ, plaintiff, and her attorney ensued as to the contents of the discs and whether they were already part of record. Plaintiff argues that the conversation put the ALJ on notice that she had additional treatment between October 2006 and April 2008 and, therefore, the ALJ should have considered those medical records before rendering his decision as to plaintiff's disability. We agree. Although the record does not clarify the content of the compact discs, it shows that plaintiff made several

---

[161] 20 C.F.R. § 404.1512(d).
[162] *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).
[163] *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).
[164] 20 C.F.R. § 404.1512(d).

references to treatment she received from Dr. Farrell in the year 2007 and to other recent treatment, including several MRIs.

While "an ALJ's decision must be based upon consideration of all the relevant evidence,"[165] in the present case, the ALJ did not inquire as to what medical records were on those discs or probe plaintiff's recent medical history and ongoing impairments. The Court, therefore, finds that the ALJ did not meet his burden in developing a full and fair record.

## B.     The ALJ's Determination of Plaintiff's RFC

Plaintiff next argues that the ALJ's determination of plaintiff's RFC was improper. She argues that the ALJ did not articulate any rationale for his conclusion other than to discount her credibility and the views of the state agency reviewing physicians. Defendant responds that the RFC determination was supported by the record as a whole.

The RFC is an administrative assessment of what work-related activities a claimant can perform despite one's physical and mental limitations.[166] In determining RFC, ALJs evaluate the claimant's age, ability to lift weight, sit, stand, walk, push, pull, and any other factors that would be helpful in gauging the claimant's ability to perform sedentary, light, medium, heavy or very heavy levels of work.[167] In assessing the claimant's RFC, ALJs must consider both the medical and nonmedical evidence in the record.[168]

Generally, opinions of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in disability

---

[165] *Smith*, 231 F.3d at 438.
[166] *See* 20 C.F.R. § 404.1545(a); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *Hickman v. Apfel*, 187 F.3d 683, 688-89 (7th Cir. 1999).
[167] 20 C.F.R. § 404.1567.
[168] 20 C.F.R. § 404.1545.

determinations.[169] Under the applicable social security regulations, ALJs are usually required to explain the weight given to the opinions of a claimant's treating physicians.[170] Once ALJs have determined a claimant's RFC, they are expected to minimally articulate reasons for crediting or rejecting evidence of a disability.[171] Although ALJs need not address every single piece of evidence in their decisions, they must build "an accurate and logical bridge" between the evidence and their findings of plaintiff's RFC.[172]

The Court is troubled with the ALJ's articulation of plaintiff's RFC assessment. The ALJ's brief and cursory discussion of plaintiff's RFC fails to articulate reasons for his findings, contains inaccurate statements, and fails to build "an accurate and logical bridge" between evidence and his findings. The Court agrees with plaintiff's position that the ALJ did not explain the rationale for his conclusion, other than to discount plaintiff's credibility and the views of the state agency reviewing physicians.

In making his physical RFC determination, the ALJ appears to have relied primarily on the findings of one physician, Dr. Romeo. The Court, however, notes that the discussion of portions of Dr. Romeo's report appears in the context of his findings as to plaintiff's severe impairments, not her RFC. Because the ALJ did not state that he based his findings as to plaintiff's RFC on Dr. Romeo's report, the Court cannot uphold the decision on that ground because it was not articulated by the ALJ.[173]

Moreover, even if this Court assumes that the ALJ based plaintiff's RFC findings on Dr. Romeo's report, it is not clear why the ALJ failed to address opinions of the treating doctor in his

---

[169] *Clifford*, 227 F.3d at 870.
[170] 20 C.F.R. § 404.1527(d)(2).
[171] *See Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995).
[172] *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).
[173] *Steele*, 290 F.3d at 941.

decision. The ALJ in this case determined that plaintiff could do occasional reaching with both upper extremities.[174] Both parties agree that for social security purposes, the term "occasionally" means up to two hours in an eight-hour workday.[175] The ALJ's RFC findings, however, are not consistent with some of the limitations identified by plaintiff's treating physician, Dr. Dhiman, who restricted plaintiff to no overhead lifting, no repetitive use of the right arm, and at one point at least, to no lifting.[176] The Court is concerned with the fact that the ALJ failed to explain Dr. Dhiman's notes and how those were, or were not, considered when the ALJ made his RFC determination. It is unclear to this Court how the ALJ came up with the limitation that the claimant could perform up to two hours of overhead reaching with both upper extremities in an eight-hour workday. The ALJ's failure to provide even a brief discussion of Dr. Dhiman's notes or articulate any other reasons for his findings leaves the Court unable to trace the ALJ's reasoning and grounds for his decision.

In his brief, the Commissioner argues that the RFC determination was supported by the record as a whole. The Commissioner, however, misses a point here. In *Steele v. Barnhart*, the Commissioner argued that "the record as a whole" filled the gaps in the ALJ's analysis.[177] The Seventh Circuit rejected that argument, stating that regardless of whether there was enough evidence in the record to support the ALJ's decision, principles of administrative law required the ALJ to rationally articulate the grounds for the decision and confined the court's review to the reasons supplied by the ALJ.[178]

---

[174] R. at 13.
[175] *See* SSR 96-9p.
[176] R. at 206, 238, 239.
[177] *Steele*, 290 F.3d at 941.
[178] *Id.*

Furthermore, the ALJ's decision contains some inaccurate statements. For instance, the ALJ stated in his decision that "[t]here were no limitations from the claimant's doctors."[179] In his brief, the Commissioner admits that contrary to the ALJ's statement, there were such limitations in the record. The Commissioner then argues that any misstatement is harmless because the exertional limitations in the ALJ's RFC findings are essentially consistent with doctors' limitations. The Court disagrees because the ALJ's RFC assessment regarding plaintiff's reaching with both upper extremities is different from the limitations identified by Dr. Dhiman.[180]

Additionally, the Court finds that the ALJ's misstatement that "[n]o surgery or injections were recommended"[181] is also not harmless. This statement contradicts medical records in the present case. The Commissioner explains that the statement "[n]o surgery or injections were recommended" in the ALJ's decision refers to Dr. Romeo's report. The statement, however, does not appear in relation to the ALJ's discussion of Dr. Romeo's report but, instead, is found in the context of the ALJ's finding as to plaintiff's RFC. The law requires the ALJ (not the Commissioner's lawyers) to build "an accurate and logical bridge" from the evidence to his conclusion.[182] Because the ALJ's discussion of the grounds for his decision as to the plaintiff's RFC includes inaccuracies as to essential facts and provides very little discussion of evidence to support the RFC finding, the Court must remand this case.

C.     **The ALJ's Credibility Determinations**

Plaintiff next argues that the ALJ erred in his credibility determination of plaintiff in light of the objective evidence of plaintiff's shoulder abnormalities and treatment for those conditions

---

[179] R. at 13.
[180]   *See* R. at 206, 238, 239.
[181] R. at 13.
[182] *See Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir.2009); *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007).

over a period of years. Defendant responds that the ALJ properly determined that plaintiff's claims were extreme and unsupported.

An ALJ's credibility determination cannot be invalidated unless it is "patently wrong."[183] When determining credibility, an ALJ must consider the entire case record, including claimant's statements as well as the opinions of treating or examining physicians and other persons.[184] Under Social Security Ruling 96-7p, an ALJ's credibility determination "must contain specific reasons for the findings on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[185] Moreover, an ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by subjective medical evidence.[186]

Here, the ALJ found that because plaintiff had given significantly extreme limitations that seemed implausible, her allegations were not fully credible. More specifically, he noted that although plaintiff's medically determinable impairments could reasonably produce the alleged symptoms, her statements concerning the intensity, duration, and limiting effects of those symptoms were not entirely credible.[187] One of the reasons given by the ALJ in support of his findings that plaintiff's limitations were extreme and unsupported was that plaintiff "had a sharp pain in her fingers and hands, pain with reaching overhead, pushing, pulling, and lifting and carrying only five pounds, and constant shoulder pain."[188] But the ALJ stated nothing more. The determination, therefore, did not contain specific reasons for the credibility finding, and did not

---

[183] *Prochaska*, 454 F.3d at 738; *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002).
[184] SSR 96-7p.
[185] *Id.*
[186] *Id.*
[187] R. at 13.
[188] *Id.*

include a sufficiently specific explanation to make clear the reasons for the weight the ALJ gave to plaintiff's testimony regarding her limitations.

Furthermore, in assessing plaintiff's credibility, the ALJ relied on his findings of plaintiff's RFC. The problem with this approach, however, is that the ALJ's RFC finding was not properly supported. Different RFC findings, accordingly, would, or could have, affected the ALJ's credibility determination. For this reason, on remand, the ALJ's credibility evaluation may also change.

**D.      The ALJ's Reliance on the VE's Testimony**

Finally, plaintiff contends that the hypothetical question posed to the VE was improper because it directed her to assume that plaintiff had an ability to lift up to five pounds and an ability to do occasional reaching with both upper extremities. When an ALJ asks a VE a hypothetical question, the question must include "*all* limitations supported by medical evidence in the record."[189] This ensures that a VE does not include jobs the claimant cannot perform "because the expert did not know the full range of the applicant's limitations."[190] Because the Court has found errors in the ALJ's RFC assessment, it is not necessary to determine whether the ALJ properly framed his hypothetical question or relied on testimony from the VE.  However, to the extent that the ALJ revises his RFC assessment, he should ensure that any hypothetical posed to the VE includes all of the limitations supported by substantial evidence.

Although we are remanding this case, we should note that plaintiff was represented by counsel at the hearing, who had the opportunity to cross-examine the VE and raise any issues that she believed were not appropriately included in the hypothetical question. In *Ragsdale v.*

---

[189] *Steele*, 290 F.3d at 942  (Emphasis in original).
[190] *Id.*

*Shalala*, the Seventh Circuit stated that a claimant who cross-examines the VE should raise any issues she believes were not properly addressed in the hypothetical.[191] In the present case, Ms. Quilter, plaintiff's attorney, in fact, cross-examined the VE, but did not raise any questions or objections regarding the ALJ's assumptions about plaintiff's physical limitations.[192] Plaintiff, therefore, has waived any argument that the hypothetical provided was inappropriate.[193]

CONCLUSION

For the reasons set forth above, plaintiff's Motion for Judgment on the Pleadings is granted [dkt. 18] and defendant's Motion for Summary Judgment is denied [dkt. 25]. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: April 19, 2010

U.S. Magistrate Judge
Susan E. Cox

---

[191] 53 F.3d 816, 819 (7th Cir. 1995).
[192] R. at 39.
[193] *See Ragsdale*, 53 F.3d at 819.